Ex. D

Suppression Hearing Transcript dated March 10, 2023

# In the Matter Of:

SOF V. MICHAEL CHRISTOPHER BROWN

2022-MM-8014-A-O

# MOTION TO SUPPRESS

*March 10, 2023*

ESQUIRE
DEPOSITION SOLUTIONS
800.211.DEPO (3376)
EsquireSolutions.com

IN THE CIRCUIT COURT OF THE NINTH JUDICIAL CIRCUIT
IN AND FOR ORANGE COUNTY, FLORIDA

CASE NO.: 2022-MM-8014-A-O

STATE OF FLORIDA

vs.

MICHAEL CHRISTOPHER BROWN,

Defendant. NON-APPEAL TRANSCRIPT

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

MOTION TO SUPRESS
BEFORE THE HONORABLE MARTHA C. ADAMS
COUNTY COURT JUDGE

TRANSCRIPT OF PROCEEDINGS

(TRANSCRIBED VIA DIGITAL RECORDING)

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

DATE TAKEN: MARCH 10, 2023

TIME: 10:00 A.M.

PLACE: ORANGE COUNTY COURTHOUSE
425 N. ORANGE AVENUE
ORLANDO, FLORIDA 32801

TRANSCRIBED BY: CHRISTINE AIELLO

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

APPEARANCES:

LUCINDA LOUIS, ASSISTANT STATE ATTORNEY
Office of the State Attorney, Ninth Circuit
415 N. Orange Avenue
Orlando, Florida 32801
(407) 836-2433
llouis@sao9.org

Attorney for STATE OF FLORIDA

KEVIN C. MAXWELL, ESQUIRE
OFFICE OF KEVIN C. MAXWELL
255 Primera Boulevard
Suite 160
Lake Mary, Florida 32746
(407) 480-2179
kevincmaxwell@gmail.com

Attorney for Defendant
CHRISTOPHER MICHAEL BROWN

C O N T E N T S

MARCH 10, 2023

MOTION TO SUPRESS

STATE'S CASE IN CHIEF

TESTIMONY OF JONATHAN VELEZ
Direct Examination by Ms. Louis 6
Cross-Examination by Mr. Maxwell 30
Redirect Examination by Ms. Louis 50
Recross-Examination by Mr. Maxwell 52

ARGUMENT
By Mr. Maxwell 55
By Ms. Louis 58

REBUTTAL
By Mr. Maxwell 66

CERTIFICATE OF TRANSCRIPTIONIST 70

INDEX OF EXHIBITS IN EVIDENCE

State's Exhibits

1 Body-Worn Camera Video-Recording - Deputy Velez 12

Defense's Exhibits

1 CAD Report and Arrest Affidavit - Deputy Velez 54

P R O C E E D I N G S

THE COURT: Okay. Good morning. We are on the record in 2022-MM-8014-A-O. This is Michael Christopher Brown.

Mr. Maxwell, Mr. Brown is with you. This is your motion to suppress that you had filed back on January 16th. I did read over the motion. I do find it to be legally sufficient. I will note that there's no arrest warrant in the court file.

So, Ms. Louis, would you like to call your first witness?

MS. LOUIS: Yes, Your Honor. The State calls Jonathan Velez -- Deputy Jonathan Velez to the stand.

THE COURT: Okay.

Was there anything we needed to discuss before we got started? I'm sorry. I should have asked that, but --

MR. MAXWELL: Your Honor, I think after Deputy Velez testifies, I may want to address some issues with the Court outside the presence of the witness before I begin my cross.

THE COURT: Okay.

Deputy, you can go ahead. Thank you.

THE CLERK: (Indiscernible). Raise your right hand, please. Do you swear or affirm to tell the

truth, the whole truth, and nothing but the truth?

THE WITNESS: Yes, I swear.

THEREUPON,

JONATHAN VELEZ,

called by the State as a witness, was duly sworn and testified as follows:

THE CLERK: Thank you.

THE COURT: And, Ms. Louis, you can move that around if you want. I know it's --

MS. LOUIS: It --

THE COURT: -- you're sort of stuck looking at me right now.

MS. LOUIS: I don't think I have a -- okay. I do have a screen.

THE COURT: Yeah.

MS. LOUIS: Okay.

THE COURT: Just be careful of the cord.

MR. MAXWELL: Don't break the internet.

MS. LOUIS: I will try not to.

DIRECT EXAMINATION

BY MS. LOUIS:

Q Hello, Deputy Velez. Can you please state and spell your full name for the record?

A Jonathan Velez, J-o-n-a-t-h-a-n V-e-l-e-z.

Q And where you currently employed?

A Orange County Sheriff's Office.
Q And as of November 14th, 2022, where were you employed?
A Orange County Sheriff's Office.
Q And as of November 14th, 2022, how long had you been employed with the Orange County Sheriff's Office?
A Almost five years.
Q And what was your position?
A Deputy sheriff.
Q And what is your duties as deputy sheriff?
A To enforce the laws of the State of Florida and Orange County.
Q Okay. Can you go more into details about your duties?
A Specifically, I patrol the International Drive corridor, which is (indiscernible) complicated. We are using bike units. So mostly, I do bike patrols (indiscernible).
Q And what sector did you cover?
A I am in (indiscernible) to transition sector five (indiscernible) east (indiscernible).
Q And what county and state would that be in?
A Orange County, Florida.
Q And was that within the jurisdiction of the

department you were employed by?
A Yes.
Q And what training did you receive to become an officer -- well, a deputy with the Orange County Sheriff's Office?
A I completed the basic academy, the law enforcement academy. I also did the basic recruiter training for Orange County Sheriff's Office. I also did the field training officer training.
Q Can you get more into detail about the basic academy training?
A It's a six-month period law enforcement academy as required by the state of Florida to become an officer.
Q And in your number of years as a deputy, how -- approximately how many times have you initiated a wellness check?
A I know hundreds. It's hard to tell.
Q So let's transition to the date of incident. Were you working on November 14th, 2022?
A Yes, I was.
Q And what shift did you work?
A Our hours are usually 1500 hours to (indiscernible) hours.
Q And do you recall the location?

A It was the Miller Ale House yes, on International Drive.

Q And on that day around 8:59 p.m., do you recall making contact with a person later identified to you as Michael Christopher Brown?

A Yes, I do.

Q And how did you encounter him?

A Myself and my sergeant, Sergeant Shaheed were on foot patrol in the parking lot of the Miller Ale House, and we saw the -- a green (indiscernible) on the (indiscernible) that was running. And so usually, when vehicles are running late at night, we -- we like to make sure that the persons in the car is okay.

Q Okay.

A So we walked up to the vehicle and made contact with him.

Q And after you made contact with the Defendant, where was Sergeant --

A Shaheed?

Q Yeah. Sorry.

A She was in the passenger side by the passenger front end.

Q And again, where was your location?

A Mine was the driver's side on the driver's side -- front driver's side.

Q And why are you guys positioned as such?

A For officer safety, as well as to see better into the vehicle to see if there's more occupants or, you know, to see -- have a better view of the vehicle.

Q And again, what was the reason for your encounterment -- your encounterment with the Defendant?

A Check on wellbeing.

Q And on November 14th, 2022, were you equipped with cameras?

A Yes.

Q Was those cameras activated on that date?

A Yes.

Q Oh, but just prior before we get to your body-worn camera, within your patrol of the area, what is your normal procedure?

A Normally, we check into cars because we -- often we run into the drug overdosing in that. So the way we -- we walk around and we patrol on bikes, we patrol in vehicles. We drive around in parking lots. And we check out what any car or any vehicle might be occupied possibly to make sure that that's not what's occurring.

Q And while you're patrolling, are you in contact with dispatch?

A Yes. (Indiscernible).

Q Can you explain that for me?
A So because we are a special team, we're not necessarily patrolling alone, we're just doing checks, as well, we usually put ourselves in checks in different areas and (indiscernible) take that area and look around, for our safety and just to have a location based for dispatch.
Q And does your check with dispatch changes when you encounter anyone?
A It's suppose to, yes. When we call out a new encounter on the radio, that's supposed to get updated.
Q So just to clarify, the start of your checking with dispatch --
A And give the location, yes.
Q And when you write your reports, what checks do you go off of?
A I usually go by the last check that I initiate with the person I made contact with, whatever timestamp that would be or whenever the check originated in that patrol area.
Q Okay. And back to your body-worn camera. Were those cameras active -- were those cameras on your person activated that date?
A Mine was, yes.
Q And did it capture the events that occurred

approximately around 8:59 p.m.?
A Yes.
MS. LOUIS: Showing the witness what has previously been marked as State's Identification A for -- State's Identification A for identification.
BY MS. LOUIS:
Q Do you recognize this?
A Yes.
Q And how do you recognize it?
A Because my initials and signature and the date and time.
Q And did you have an opportunity to view this video before the motion today?
A Yes, I did.
Q And does this video fairly and accurately depict the incidents that occurred on the night in question?
A Yes, it does.
MS. LOUIS: At this time the State moves what was previously marked as State Identification A in --
Oh, sorry. I have to show it to you.
MR. MAXWELL: I don't think I have any objection to that, Your Honor.
MS. LOUIS: Okay.
THE COURT: Okay.

(State's Exhibit No. 1 was admitted into evidence.)

MS. LOUIS: At this time the State moves what was previously marked as State identification A, and shown to the Defense counsel, into evidence as State Exhibit 1.

Permission to publish State Exhibit 1?

THE COURT: Yes.

MR. MAXWELL: Well, for clarification, is that just Deputy Velez's videos?

MS. LOUIS: Yes.

MR. MAXWELL: All right. Thank you.

MS. LOUIS: Thank you.

(Brief pause in proceedings.)

MS. LOUIS: One moment, Your Honor.

THE COURT: Uh-huh.

(Brief pause in proceedings.)

MS. LOUIS: (Indiscernible).

MR. MAXWELL: (Indiscernible).

MS. LOUIS: I was just wondering. It's already saying it's up, and I don't know why it says that.

THE COURT: Is it not doing what it did before for you?

MS. LOUIS: No. It's basically saying it's

already running in the background, but it's not showing up. And it won't allow Reggie to use it, either, because it's saying it's already --

FEMALE SPEAKER: That it's connected.

THE COURT: Yeah, yeah.

(Brief pause in proceedings.)

MS. LOUIS: I had to restart my laptop to get it to work.

THE COURT: It's okay.

MS. LOUIS: And, Your Honor, just for the record and for clarification, I will be stopping the video at some point just to have Deputy Velez explain.

THE COURT: Okay.

MS. LOUIS: Okay.

THE COURT: Will you turn some of the lights off? Thanks.

(A video-recording was published in open court. This transcript should not be considered a verbatim record of those proceedings due to sound quality and inability to see video-recording. Radio communications not transcribed.)

MICHAEL CHRISTOPHER BROWN: You know, on -- on our jobs, a lot of people park out here because the parking garage is usually full.

DEPUTY VELEZ: Yeah, no, I'm not saying you're

parked out here say problem. It's just you being here, we've got to make sure you're okay, not passed out. You do realize it's a party area? People get drunk. They pass out behind the wheel. That can constitute a DUI. Do you understand?

MICHAEL CHRISTOPHER BROWN: Right.

DEPUTY VELEZ: So we have to make sure you're not like that. We also found a guy the other day that was passed out dead behind the wheel for five days, and nobody cared about it.

MICHAEL CHRISTOPHER BROWN: Okay.

DEPUTY VELEZ: So that's what we're doing. Okay?

MICHAEL CHRISTOPHER BROWN: I understand.

DEPUTY VELEZ: All right, man. So you might want to clean your tag. It's extremely dirty.

MICHAEL CHRISTOPHER BROWN: Okay.

DEPUTY VELEZ: All right. Just giving you a little bit of advice, bro.

MICHAEL CHRISTOPHER BROWN: Okay. It's not (indiscernible).

DEPUTY VELEZ: If it's obscured by dirt or by anything, you can get stopped.

MICHAEL CHRISTOPHER BROWN: Okay. That's fine.

DEPUTY VELEZ: Whether you want to listen to it or not, that's up to you. When you got stopped, then don't say you weren't warned.

MICHAEL CHRISTOPHER BROWN: All right.

DEPUTY VELEZ: Do you understand what I'm saying?

SERGEANT SHAHEED: Tell him don't move.

MICHAEL CHRISTOPHER BROWN: Right.

DEPUTY VELEZ: All right.

SERGEANT SHAHEED: Tell him don't move.

DEPUTY VELEZ: Don't move.

(Video-recording stopped.)

BY MS. LOUIS:

Q Deputy Velez, at this point when guns are withdrawn, why is that?

A Sergeant Shaheed is just advising that --

MR. MAXWELL: Objection. Hearsay.

MS. LOUIS: Your Honor, that's -- that's not -- hearsay is allowed at motions for suppresses. And also --

MR. MAXWELL: Your Honor --

MS. LOUIS: -- within that --

MR. MAXWELL: -- he can't say what she said.

THE COURT: Okay. I -- I've got to let her finish trying to --

MR. MAXWELL: Yeah.

THE COURT: -- argue at least what she's trying to say.

MS. LOUIS: And, Your Honor, within this encounterment and the situation, this is the way Sergeant Shaheed is signaling and informing her officer, based off of the fellow officer rule, that there is a weapon in sight.

MR. MAXWELL: Your Honor --

THE COURT: Yes, sir.

MR. MAXWELL: -- State can't testify, either.

MS. LOUIS: I'm arguing, not testifying.

THE COURT: No, I -- I know, but I think what he's arguing about is the fact that there's a gun. So are you -- because -- are you arguing because it's the truth of the matter?

MR. MAXWELL: I'm arguing, Your Honor, that there's nothing on this video that says that Deputy Velez was told there is a gun.

THE COURT: Okay. Yeah.

MR. MAXWELL: There's -- there's no audio, there's no video that says there's a gun.

THE COURT: Yeah. Where -- where -- because you're saying all the sudden he pulls out guns. And he's saying, because he did that because he heard

something, but wouldn't we have heard that since we are watching his video?

MR. MAXWELL: We would have, but we didn't.

THE COURT: Well, no, I'm asking -- yeah, I'm asking Ms. Louis.

MS. LOUIS: Yes, Your Honor. I could --

THE COURT: Well, you ask him how he -- if he -- why he thinks that.

MS. LOUIS: Okay.

BY MS. LOUIS:

Q Deputy Velez --

MS. LOUIS: Sorry, just one moment, Your Honor.

THE WITNESS: Your Honor, if I may.

THE COURT: Well, hold --

MS. LOUIS: I have to --

THE COURT: Hold on.

THE WITNESS: All right.

THE COURT: Let me just let her ask you some questions.

BY MS. LOUIS:

Q Deputy Velez, why were guns withdrawn?

A I was just advised by the sergeant the gun -- there was a gun at (indiscernible).

Q And how were you advised?

A Verbally.

MS. LOUIS: Your Honor, may I continue or --

THE COURT: Well, I -- is it --

MS. LOUIS: I didn't know if that's --

THE COURT: How about this, deputy, how is it that we can't hear it?

THE WITNESS: I believe she did say gun in the video.

MS. LOUIS: Should I --

THE COURT: Can you --

MS. LOUIS: -- rewind?

THE COURT: -- back it up?

MS. LOUIS: Uh-huh.

THE WITNESS: Yes. She just says gun, I believe is what you hear, Your Honor.

(Video-recording started.)

DEPUTY VELEZ: Do you understand what I'm saying?

(Video-recording stopped.)

MS. LOUIS: Sorry. I --

THE WITNESS: Go ahead.

MS. LOUIS: Deputy --

(Video-recording started.)

SERGEANT SHAHEED: Tell him don't reach.

DEPUTY VELEZ: Don't -- keep your hands where

I can see them.

(Video-recording stopped.)

THE COURT: Do you hear something there?

THE WITNESS: It was before she (indiscernible).

(Video-recording started.)

DEPUTY VELEZ: This is --

SERGEANT SHAHEED: Get out of the --

DEPUTY VELEZ: This is --

SERGEANT SHAHEED: -- car.

DEPUTY VELEZ: -- now me telling you --

THE WITNESS: (Indiscernible) she said.

DEPUTY VELEZ: -- that everything that comes out of my mouth --

(Video-recording stopped.)

THE WITNESS: It's just, it's low; but if you look at the video where she's at, not at me, but at her.

THE COURT: I can't see crap, but --

THE WITNESS: Okay. And I know it's a little grainy, but -- oh, actually, on your screen it's a lot worse than mine. I'm sorry. Yeah. My screen is a lot purer. If you go a little back before she draws her gun --

MS. LOUIS: Sorry.

THE WITNESS: -- she's looking straight at me.

MS. LOUIS: Should I rewind?

THE WITNESS: Yes.

THE COURT: Mr. Maxwell, does he -- I don't --

MR. MAXWELL: Yes, he --

THE COURT: He does have a --

MR. MAXWELL: -- does have a better --

THE COURT: -- better video.

MR. MAXWELL: He has a much better video, actually. I didn't realize that.

THE COURT: I think it's because when it gets isolated --

MR. MAXWELL: Yes.

THE COURT: -- to there. I -- because on this -- on that video, I didn't even know --

MS. LOUIS: I can see her.

THE COURT: -- she was standing there.

THE WITNESS: Yeah, she's right there.

MS. LOUIS: I can see her right there. Like --

THE WITNESS: Actually (indiscernible) over here.

MS. LOUIS: Yeah.

THE WITNESS: So if you rewind it.

MS. LOUIS: And then --

THE COURT: Can you rewind it a little bit more, Ms. Louis?
THE WITNESS: A little more.
MS. LOUIS: Yes, Your Honor.
THE WITNESS: A little more.
MS. LOUIS: A little more.
(Video-recording started.)
DEPUTY VELEZ: This is -- this is now --
(Video-recording stopped.)
MS. LOUIS: Let's --
THE WITNESS: A little more.
(Video-recording started.)
DEPUTY VELEZ: Do you understand what I'm saying?
(Video-recording stopped.)
MS. LOUIS: More?
THE WITNESS: Actually, right there.
MS. LOUIS: Okay. Right here.
(Video-recording started.)
DEPUTY VELEZ: All right.
(Video-recording stopped.)
THE WITNESS: See, that's Sergeant Shaheed (indiscernible).
(Video-recording started.)
SERGEANT SHAHEED: Tell him don't move.

DEPUTY VELEZ: Don't move. Keep your hands where I can see them. This is --

SERGEANT SHAHEED: Get out of the --

DEPUTY VELEZ: This is now --

SERGEANT SHAHEED: -- car.

DEPUTY VELEZ: This is now me telling you that everything that comes out of my mouth is an order.

(Video-recording stopped.)

MS. LOUIS: Your Honor, I didn't know if I should keep playing because that's where the objection happened. And I wasn't sure if we were waiting on you to rule or not.

THE COURT: Well, I'll go ahead and allow it to be testified.

I think, Mr. Maxwell, you certainly have the right to cross-examine exactly what you're talking about.

MR. MAXWELL: Thank you, Judge.

THE COURT: Okay.

(Video-recording started.)

SERGEANT SHAHEED: (Indiscernible).

DEPUTY VELEZ: So keep your hands up. Raise your right hand.

SERGEANT SHAHEED: (Indiscernible).

DEPUTY VELEZ: All right. You're going to put

your phone on the -- on the dash slowly.

MICHAEL CHRISTOPHER BROWN: I've got somebody on the phone right now.

DEPUTY VELEZ: It doesn't matter. We are being recorded.

SERGEANT SHAHEED: (Indiscernible).

DEPUTY VELEZ: Do you understand? So that's (indiscernible). Slowly get out of the car. Slowly get out --

SERGEANT SHAHEED: Open the door and --

DEPUTY VELEZ: -- of the car.

SERGEANT SHAHEED: -- get out of the car. Do it now. Keep your hands --

DEPUTY VELEZ: Get out.

SERGEANT SHAHEED: -- up.

DEPUTY VELEZ: Hey, what did I say about your hands? Step out. Keep your hands where I can see them. Get up against the car.

SERGEANT SHAHEED: (Indiscernible). No. (Indiscernible).

MICHAEL CHRISTOPHER BROWN: (Indiscernible).

DEPUTY VELEZ: Yes. Come around. Come around. Come around.

Don't move.

MICHAEL CHRISTOPHER BROWN: I -- I'm not

moving.

DEPUTY VELEZ: Come around.

(Video-recording stopped.)

BY MS. LOUIS:

Q And, Deputy Velez, during this moment, who are you saying come around to?

A To my sergeant.

Q And does she come around?

A She eventually does, yes.

Q Oh, and during this moment, what are you doing?

A I'm trying to maintain control over Mr. Brown for --

Q And what --

A -- officer safety.

Q Sorry. I think I may have spoken. You were speaking. Can you repeat that, please?

A I'm trying to control the -- the subject, Mr. Brown, for officer safety because there is a gun in the vehicle.

MS. LOUIS: I'm not sure what happened to my volume. So sorry.

(Video-recording started.)

MICHAEL CHRISTOPHER BROWN: (Indiscernible).

(Video-recording stopped.)

MS. LOUIS: My volume went out.

THE COURT: That's okay. I would maybe go out and go back in. I think you're doing exactly what I would do.

(Brief pause in proceedings.)

(Video-recording started.)

DEPUTY VELEZ: (Indiscernible) behind the wheel.

(Video-recording stopped.)

(Brief pause in proceedings.)

MS. LOUIS: Your Honor, it seems like my video won't play unless I restart it, but I can finish the rest of my motion without the video.

THE COURT: Okay.

BY MS. LOUIS:

Q And, Deputy Velez, once Sergeant Shaheed comes around, what happened?

A Oh, I take my firearm out of my holster and I secure (indiscernible).

Q And at that time was he under arrest?

A No.

Q What was going on?

A We got reasonable suspicion that he was in possession of a firearm and open carry. And due to the firearm, he was detained (indiscernible).

Q And at any point did you ask the Defendant if he had a concealed weapons permit?
A Yeah, shortly after, and I asked him if he possessed a concealed firearms permit, to which he advised, what was that.
Q At any point in the encounter, did he ever give a direct response?
A No. Not to me.
Q And who did he give a direct response to?
MR. MAXWELL: Objection. Calls for hearsay.
BY MS. LOUIS:
Q At any point --
MS. LOUIS: Okay. I'll let it go.
Oh, Your Honor, I again, would say that in motions to suppresses hearsay are allowed. And so I would say it's okay, but --
THE COURT: I don't -- I don't know what the answer is because I don't know that -- I'm assuming somebody else tells him.
MS. LOUIS: Oh, no. It's the Defendant who tells the officer within --
THE COURT: So it's a statement by the Defendant?
MS. LOUIS: Yes, Your Honor.
THE COURT: Okay.

Overruled.

BY MS. LOUIS:

Q So at any point did he ever give a direct answer?

A He told Sergeant Shaheed that he didn't have it.

Q And at any point -- where were you -- where were you after you had asked him if he had a concealed weapons permit?

A Where was I standing?

Q Or what happened after?

A After he said he didn't know what a concealed weapons his permit was, and he advised that his sheriffs friends had told him he could have a gun in the vehicle. I proceeded to retrieve the firearm in the vehicle to make it safe, which means emptying the magazine and any ammo that might be chamber. And obviously, taking it in for evidence.

Q And where was the gun located?

A It was jammed between the front seat where Mr. Brown was sitting and the center console.

Q Was it appearable?

A I'm sorry?

Q Was it appearable?

A Appearable like seen?

Q Within the position.
A Yes.
Q And at what point during the encounter would you say Mr. Brown was placed under arrest?
A After I retrieved -- we retrieved the firearm and confirmed that he didn't have a concealed weapons permit.
Q And at any point of the -- the encounter was Miranda read?
A Yes.
Q But what happened -- what happened?
A Mr. Brown invoked and said he didn't want to speak.
Q And at that point did you continue questioning him?
A No.
Q And did all the events occurred in -- where did all the events occurred in?
A Orange County, Florida.
MS. LOUIS: No further question, Your Honor.
THE COURT: Okay.
Mr. Maxwell, did you want the witness to step down?
MR. MAXWELL: No, Your Honor. I'm going to have to clear some things up --

THE COURT: Okay.

MR. MAXWELL: -- (indiscernible) the arrest (indiscernible).

May I approach the witness, Your Honor?

THE COURT: Absolutely.

MR. MAXWELL: Oh, good day. My name is Kevin Maxwell. I'm Mr. Brown's attorney if you hadn't figured that out already.

CROSS-EXAMINATION

BY MR. MAXWELL:

Q Is that your report from the night of November 14th?

MS. LOUIS: Your Honor, may State allow -- be allowed to view the report?

THE COURT: Yeah. I think he's just asking him what it is first. Then he'll show it to you.

MS. LOUIS: Oh, okay. Got it.

THE COURT: Yeah.

MR. MAXWELL: I don't want to have you look at it and then say, no, it's unauthenticated.

MS. LOUIS: Understandable.

BY MR. MAXWELL:

Q Is that your report?

A (Indiscernible).

Q I'm sorry?

A (Indiscernible). Oh, I see (indiscernible). Yes, it is.

Q I'm just going to (indiscernible). Is that the run report for the evening of November 14th? It is for this incident (indiscernible).

A It appears so. (Indiscernible) changed.

Q And are you familiar with policies and procedures of Orange County --

A Yes.

Q -- the Orange County Sheriff's Department (indiscernible)?

A Yes.

Q Is that the body-worn camera policy and procedure to which you must comply?

A (Indiscernible).

(Brief pause in proceedings.)

MS. LOUIS: Your Honor, I've seen the report. State has no objection to it, but I would have to object to the Orange County Sheriff's Office general order. Only because Deputy Velez is not the custodial records of this, not entirely sure if this is the most updated one. It's -- it's nothing within my possession. And as Deputy -- Deputy Velez said, this is effective 2021; and I'm not sure if there's another one out there that's not more updated.

THE COURT: Okay. But the -- the arrest affidavit -- or the arrest report and the CAD report, or run report, you're okay with?

MS. LOUIS: Yes, ma'am.

THE COURT: Okay.

Then in regards to the policy, Mr. Maxwell, I'll allow you to ask Deputy Velez some questions about the policy. If it turns out that there's something more that he thinks is newer or something, we can always come back to that and try to --

MR. MAXWELL: That's fine, Your Honor.

THE COURT: -- find that.

MR. MAXWELL: Again, Your Honor, may I approach?

THE COURT: Yes.

BY MR. MAXWELL:

Q What time does the encounter in -- in your report begin? And is that (indiscernible)?

A Actually, that is probably what the issue is. When we initiated our check, it's 8986 I Drive, which is actually Dave & Buster's across the street. We are on foot patrol. So the dispatcher should have initiated a completely different call. (Indiscernible).

So in this situation, let me explain.

Q Sure.
A What happens is if we're on a check, it's a general check in an area. Normally, when we call out a new incident, it generates a completely new one. So as you can see at the top, this changes. So what I go by is like the top initiation, which the check initiated at 20 (indiscernible) but Mr. Brown's encounter, as you can see the change of location, which is across the street, is at 20, 23 -- almost 24.
Q Why does your police report say 2059?
A Because I was mixing them up at the time of the call, which in turn the problem is (indiscernible) same call as the check.
Q So your previous testimony that that report is your report isn't correct, that's not your report anymore?
A When I say approximately is when the (indiscernible) from patrol, yes. Now, I was basing it off the top of the CAD call.
Q When did you --
A But the check, it should have --
Q When did you look at the CAD call?
A Usually, at the end of everything because I'm not -- I'm not at my computer, as you can see in the footage.

And if I may explain. Usually, the calls generally refresh. It's a brand-new call, not a continuation.

Q So at 2123 hours, you're saying that you're -- you've got a change of location?

A Yes, sir. You can see 8986 Dave & Busters, 8963 is Miller's Ale House. So the check continued is what -- what I'm trying to explain, not a new generated call that should have been.

Q Are there any other corrections you would like to make to your report?

A No.

Q So you took him into custody on 11/14/22 in the parking lot of the Ale House?

A Yes.

Q Why does your body camera video show that this initiated at 11 -- on 11/15 of '22?

A The body camera?

Q Yes, sir. Did you alter the body camera video?

A No, sir.

Q Why does your body camera video show that the stop started at 11/15 of '22?

MS. LOUIS: Objection. Asked and answered.

THE WITNESS: I have no control over the

timestamps on things.

THE COURT: I -- I -- okay. First of all your objection -- he hadn't answered yet, so overruled.

And then you answered. So okay.

BY MR. MAXWELL:

Q Your first body camera video ends at 023655 seconds? Because I -- I got them in pieces is the reason I'm asking. The first body camera video I got from you starts at 022127 on 11/15, and it --

MR. MAXWELL: And I don't know if I can get it started on my computer, but I can certainly show it to you.

And counsel can look at it, as well.

MS. LOUIS: Your Honor, I'm not sure of the right name for the objection. No, it's just -- what I'm trying to basically say is, technically, our office is the one that sent over the video, not specifically the officer. And so I just wasn't sure if that's an appropriate question. That's what I'm objecting to, the way the question was formed.

THE COURT: Okay. Well, let me -- let me let him finish. Because I think that's probably the most important part is to show him what he saw so that the deputy can see it so that we can figure out what's going on.

MR. MAXWELL: Would you like to join me, counsel?
MS. LOUIS: No.
BY MR. MAXWELL:
Q So your video starts here, 2021 on 11/15, and then ends --
A Okay.
Q -- at approximately 0236 and 50-something seconds for the first video. See, that's the end of the first video. Yes?
A Okay.
(Brief pause in proceedings.)
MR. MAXWELL: Sorry, Your Honor, it's just like trying to put together a puzzle.
THE COURT: Okay.
BY MR. MAXWELL:
Q Your second video starts at -- (indiscernible).
(Video-recording started.)
DEPUTY VELEZ: (Indiscernible).
(Video-recording stopped.)
BY MR. MAXWELL:
Q And this is the second video I've got. Let's see (indiscernible) his starts at 0239 and 23 seconds on 11/15. Do you see that?

A Okay.
Q So my question is, since your first video ended at 2036 and your second one started at 2039, where is the missing part of your body -- body camera video?
A When I look, 0239 is in the morning.
Q Yes, sir. On 11/15.
A You have to ask Axon. That -- that makes --
Q You don't know?
A That's three hours that went away on a CAD call (indiscernible).
Q My point exactly to --
A That -- I can't answer you that question, sir.
Q So --
A Because that's -- the timestamps are outside --
THE COURT: So --
THE WITNESS: -- my control.
THE COURT: So can I just ask for a clarification? The original one that you talked about, because you say you're getting things in -- sort of in piecemeal.
MR. MAXWELL: I am.
THE COURT: The -- the 200236 for the first

video and the 0239 for the second --

MR. MAXWELL: Are both on 11/15.

THE COURT: -- are both on 11/15. Do they appear to be of the same incident?

MR. MAXWELL: They are, Your Honor.

THE COURT: Okay. But --

MR. MAXWELL: There's just --

THE COURT: But they're different videos?

MR. MAXWELL: They're different videos, and there's pieces missing. And -- and if Your Honor will recall, when we came in before, I pointed out to the Court I was missing video. The part that I'm missing probably the most of, the part that has me the most concerned is the very first video that was shown to the deputy in his direct testimony starts after this encounter has initiated, and the body camera video is on a different day.

MS. LOUIS: Your Honor --

THE COURT: Okay.

Well, hold -- hold on.

Obviously, your client got lodged into the Orange County Jail, correct?

MR. MAXWELL: He did.

THE COURT: And did he get lodged into the jail on the 14th or the 15th?

MR. MAXWELL: On the -- I believe he was at the jail right before midnight on the 14th.

THE COURT: Okay. So my guess is, obviously, we -- we're -- we're pretty much all in agreement that the date on here is incorrect, but more importantly, you're more concerned about the fact that there's time gaps?

MR. MAXWELL: And, Your Honor, this is the evidence being used to try to convict my client, and it's not authenticatable. Nobody can tell me why it's got the wrong date on it. The deputy wants to blame the company that creates the cameras. Orange County has got a body camera video -- body-worn camera policy. It doesn't say anything about the fact that they've got different dates or times for the systems.

THE COURT: Does it tell the officers that they're supposed to make sure that everything is time --

MR. MAXWELL: They're supposed to -- they're responsible for establishing its accuracy and making sure it's on in standby mode from the moment they put it into service.

THE COURT: Okay. But I -- I -- I guess my question then is, I certainly understand the date is a concern, but considering how much issues you, me, and

Ms. Louis have all had this morning with the videos, we all realize that --

MR. MAXWELL: It -- it's --

THE COURT: -- that things aren't --

MR. MAXWELL: -- not --

THE COURT: -- perfect.

MR. MAXWELL: It's not just the date, Your Honor.

THE COURT: No. I'm -- I'm understanding. The date -- but would you agree that the date, at least the date is consistent? Meaning that everything seems to appear to be on the 15th, as opposed to the 14th?

MR. MAXWELL: According to the videos, yes, Your Honor.

THE COURT: Okay. But my other concern, from what you're saying, is that there's gaps of time missing from --

MR. MAXWELL: And --

THE COURT: -- that.

MR. MAXWELL: And it's the wrong time. The deputy says that the encounter started at 2059 hours in his report. Now he stands corrected, it actually started at 21 hours, approximately 20 minutes later.

THE COURT: Okay.

MR. MAXWELL: This says it started at 2:30 in

the morning on the 14th.

THE COURT: Okay.

MS. LOUIS: Your Honor, I --

THE COURT: Yes, ma'am.

MS. LOUIS: So sorry. I -- I do acknowledge there is a date of 11 -- the 22/11/15 right there on the corner, but even though there's some type of time, it -- it -- because I'm not the custodial of records of these videos or neither is counsel, there is nothing that -- to suggest that it is of a.m. or p.m. or what that time actually is. It's just a time. So to say that it was a.m. when we don't even see the word a.m. next to it or p.m. next to it or anything, I would say that's speculation based off of counsel's view.

And I --

MR. MAXWELL: I will inquire, Your Honor.

THE COURT: Okay.

BY MR. MAXWELL:

Q Deputy, do you keep it as military time or a.m., p.m. time?

A May you ask exactly what we keep as an a.m. or --

Q Do you keep your time records --

A My time.

Q -- on your reports in military time --

A Yes.
Q -- or in a.m., p.m. time?
A Military time.
Q Is your body camera video in a.m., p.m. time or military time?
MS. LOUIS: Well, Your Honor, I would object to that. It's speculative.
THE COURT: No, it's not. It's on the video. Would you agree that there's -- there's military time, and then there's normal time.
THE WITNESS: That's military time.
BY MR. MAXWELL:
Q Military time. Thank you.
I could go through this very laboriously with every piece of missing time, but I'm going to ask you summarily, do you have any idea how the body camera videos of your encounter with Mr. Brown on the evening in which you encountered Mr. Brown, which was either 11/14 or 11/15 that you believe was sometime between nine and 10:00 on that evening, how they got edited and time removed?
A I don't know.
Q Do you believe that you have the authority to place somebody under arrest for the possession of a firearm without any indication of another crime?

A If the crime is carrying a concealed firearm without a permit, yes.

Q But you arrested him before you figured that out?

A No.

Q Did you --

A I detained him.

Q You handcuffed him, and you questioned him?

A No. I detained him.

Q Did you handcuff him?

A Yes.

Q Did you question him?

A Yes.

Q After you questioned him, then did you go back after you searched his car and Mirandize him while he was in the back of a police unit?

A At the end, yes, sir. That is -- he was -- he was arrested then.

Q So this whole time that he's in handcuffs, he could have left?

A Well, he's detained.

Q What was he detained for?

A For having an open firearm -- carrying an open firearm.

Q So you were -- you took him into custody --

A Yes.
Q -- for possession of a firearm?
A You're right.
Q Did you believe he was a convicted felon? And -- and, deputy, I know you said so on the video, so I'm going to give you that. Did you believe he was a convicted felon?
A No.
Q Why did you say to your partner that you believed he was a convicted felon?
A I don't recall.
Q What crime was he committing that initiated your ability to have him stopped, encounter with him, and search his vehicle?
A He wasn't stopped. He was just -- the vehicle was already stopped. I did not --
Q So --
A I did not detain him or stop him. I initiated a consensual encounter.
Q Did you tell Mr. Brown that he was free to leave when you walked up and stuck your flashlight in his car?
A We didn't tell him he couldn't leave.
Q So you didn't tell him he couldn't --
A I was --

Q -- leave?
A -- having a conversation.
Q How many seconds into this encounter did you pull your firearm on Mr. Brown?
A You'd have to refer to the video.
Q I got it at 58 seconds. Is that about right?
A Refer to the video.
Q What crime did Mr. Brown commit that initiated this contact with him?
A It was a consensual encounter.
Q Did he ask you any questions?
A It was a check on wellbeing, consensual encounter.
Q Who reported his wellbeing needed to be checked?
A It -- we check on people to make sure they're okay. Because people do show up dead and ODed constantly in my line of duty.
Q And what crime were you investigating when you started questioning Mr. --
A I --
Q -- Brown?
A I was not questioning him. And I was not -- he was not committing a crime while I was still talking to him.

Q Did he threaten you in any way?
A No.
Q Did he do anything furtive in his behavior with you in the car?
A No.
Q How was Mr. Brown to know that when you said, come around, you were talking to your partner and not to him?
A Do you need to know? It's a safety -- it's a safety issue that I'm addressing at that point with my partner. It had nothing to do with Mr. Brown.
Q Well, in the video, you've got your gun pointed and pushed into Mr. Brown's back.
A Yeah.
Q And you're telling him to come around.
A I'm not telling him. I'm telling her.
Q How does he know you're not talking to him? Did you not say on this video, every word that comes out of my mouth is an order to you?
A Yes. But he's not charged with anything related to that.
Q So being held at gunpoint means that he --
A That's because of the gun --
Q -- can leave?
A -- in the vehicle, sir, not because of --

Q Why did you feel --
A -- (indiscernible).
Q -- you had the right to take him into custody because you saw the gun?
A Because he is openly carrying a weapon.
Q That's not what you charged him --
A A firearm.
Q -- with.
A Carrying a concealed firearm without a permit.
Q How did you know he didn't have a permit when you took him into custody?
A Because the gun is open, and -- and it should have been concealed.
Q Do you believe that a moment --
MR. MAXWELL: My decor is taking (indiscernible).
BY MR. MAXWELL:
Q -- a momentary display of the butt of a firearm by a concealed weapon carrier constitutes grounds to arrest them?
A To investigate it, yes.
Q And where did you get taught that?
A In the academy.
Q Were you taught at the academy that any time

you find a person with a gun, you are to take them and detain them, keep them handcuffed until you determine the legality of the firearm?

A I can detain them, but not -- are you saying firearm -- you mean like explosive firearm, not like --

Q No. I'm asking you, if you become aware of an individual or suspect an individual is carrying a firearm, were you taught at the academy that you are to immediately secure them, secure the firearm, and then conduct an investigation?

A You're saying suspected. In this case we knew.

Q You knew what?

A That he was carrying a firearm.

Q You knew?

A Based on my fellow officer's (indiscernible), yes. My sergeant said he had a firearm.

Q Well, according to the video, your officer -- your fellow officer said, get him out of the car.

A And she says -- in my recollection, she said, there was zero. Get him out of the car. And zero means firearm.

Q I -- I -- I know what zero means. Thank you.

A I've just got to make sure. (Indiscernible).

MR. MAXWELL: I was zero when I got stabbed,

and it didn't do me any good.
MS. LOUIS: Your Honor, I would --
THE COURT: Do you have an objection?
MS. LOUIS: Yeah. Objection to the last thing he was saying, no relevancy to zero.
THE COURT: Okay. Sustained.
MR. MAXWELL: Good point. I -- I withdraw the statement, Your Honor.
THE COURT: Okay.
BY MR. MAXWELL:
Q Why did you search his entire vehicle?
A Because we found a firearm in plain view that was accessible, and we believed there were other firearms in the vehicle.
Q Why?
A Because there's a firearm in the vehicle.
Q So your --
A So it's --
Q -- search --
A -- legally sufficient to --
Q Your --
A -- believe that there would be other firearms and possibly ammunition.
Q You weren't trying to see if there was any contraband?

A No.
Q Did you believe you would find contraband if you searched all the nooks and crannies of the trunk of his car?
A When I search something, sir, I (indiscernible) search.
MR. MAXWELL: No further questions, Your Honor.
THE COURT: Okay.
Ms. Louis.

REDIRECT EXAMINATION

BY MS. LOUIS:
Q Deputy Velez, for clarification, when you write your report, what do you base the time of your report off of?
A The CAD report. The CAD record.
Q And when the Defendant was in handcuffs, why was he in handcuffs?
A Because there was a firearm readily accessible in the vehicle. We have reasonable (indiscernible) to believe he was openly carrying. And we detained for officer safety.
Q And at that moment was he under arrest?
A No.
Q Okay. Well, was he detained?

A Yes.
Q And why was he detained?
A Because there was an open firearm in the vehicle next to the person that was readily accessible.
Q And at any point of the encounter, did he give a direct statement as to the concealed weapons permit question?
A When I asked him if he possessed a concealed weapons permit; he said, what is that. And then I said, are you aware there's a firearm in the vehicle; and he said yes. And (indiscernible) firearm in the vehicle.
Q And last question, when was he placed under arrest?
A Once we were able to confirm that the firearm was readily accessible and confirm that he didn't possess a concealed weapons permit.
MS. LOUIS: No further questions, Your Honor.
THE COURT: Okay. The --
MS. LOUIS: Oh, may the witness be excused?
THE COURT: No. I think he has the right to cross him. It's just --
MS. LOUIS: Oh, sorry.
THE COURT: It's okay.
MS. LOUIS: Oops.

RECROSS-EXAMINATION

BY MR. MAXWELL:

Q Let me show you the arrest affidavit for that day. Did you sign that and swear to it under oath?

A Yes.

Q Do you believe that you can question somebody in custody while they're handcuffed before you give them their Miranda rights?

A No.

Q Why did you do it in this case?

A Because the firearm was readily accessible. And in his case it was for officer safety. And he was -- and we were trying to clear him rather quickly since it was over -- he was in handcuffs for officer safety. We needed to know whether we had grounds for a longer detention or not.

Q So you knew, based on your training and experience, your police academy training, your recruit training, and five years in service, that you are not supposed to question a detained witness, detained defendant, detained anybody before you advise them of their Miranda rights?

A Yes, sir.

Q After you told him his rights and he was already in the back of the car, did you ask him any

other questions, ask him his --
A No, sir.
Q -- age?
A No, sir.
Q You didn't ask him his age after he was Mirandized and you took him out of the car to move him from car one to car two?
A I don't believe so.
MR. MAXWELL: Your Honor, I'd like to go ahead and place the run report and the arrest affidavit into evidence.
THE COURT: Okay. Do you want them separate or together?
MR. MAXWELL: They can go together.
THE COURT: Okay. So that will be Defense Exhibit 1.
Any objection from the State?
MR. MAXWELL: You gave it to me through discovery.
MS. LOUIS: Oh, no. I was wondering about --
THE COURT: No. He only put in the CAD report and the arrest affidavit.
MR. MAXWELL: I didn't put the --
THE COURT: Policy.
MR. MAXWELL: -- policy and procedure in

there.

MS. LOUIS: One moment.

MR. MAXWELL: He's testified that he (indiscernible).

MS. LOUIS: No objection, Your Honor.

THE COURT: Okay.

(Defense's Exhibit No. 1 was admitted into evidence.)

THE COURT: Did you have any other questions for --

MR. MAXWELL: I don't.

I -- this witness is excused as far as the Defense is concerned, Your Honor. I don't know if the --

THE COURT: Okay.

MR. MAXWELL: -- Prosecution has any --

THE COURT: No. Okay.

MS. LOUIS: No, Your Honor.

THE COURT: Deputy, you can step down. Thank you.

THE WITNESS: Thank you.

THE COURT: Okay. And the Defense -- that was Defense 1.

And then, Ms. Louis, do you have any other witnesses that you wish to call at this time?

MS. LOUIS: No, Your Honor.
THE COURT: Okay.
Mr. Maxwell, any witnesses that you wish to call?
MR. MAXWELL: No, Your Honor.
THE COURT: Okay. Then it's your motion, I'll go ahead and let you make argument at this time.
MR. MAXWELL: Thank you, Your Honor.
I should turn this back. I better not break the internet, either, though.
All right. Your Honor, the Defense had pointed out numerous abnormalities, if you will, with the recording of the events of that evening. There is an erroneous arrest report with the wrong time for when this encounter took place. Deputy Velez did not testify. So anything that is included in the report, or the basis from the arrest, from her is excluded because she has not testified that she told --
THE COURT: You mean sergeant --
MR. MAXWELL: I'm sorry. Sergeant Shaheed, Sergeant Shaheed. Thank you, Your Honor.
THE COURT: Yes.
MR. MAXWELL: I'm looking at the word Velez when I said it.
Mr. Brown's car was searched without a warrant

and without probable cause to believe a crime has been committed. I would submit to the Court, Kirbin v. State, (phonetic) it's a 2020 case. And it stands for the proposition -- proposition that simply the mere presence of a firearm is not grounds to conduct a search. And its -- its review is rather elaborate.

I have been provided a copy of State v. Echartevera, which is from the State, apparently to argue that the plain view doctrine is applicable to this firearm. Echartevera is a 2006 case, Your Honor, and it is about drug contraband. It's clearly distinguishable from Kilburn, which is a much more recent case and addresses that issue quite clearly on the fact that carrying a firearm, concealed or unconcealed, is not the basis to be taken into custody. It's just not the basis.

There's no crime that anyone has suggested that Mr. Brown was committing at the time of this stop. And apparently, both the -- the State and the deputy want to play a word game with this Court in that that encounter they want to call it isn't a stop. It's clearly a stop under a variety of Fourth and Fourteenth Amendments, State v. Hopkins, Wong v. United States, Wong -- or U.S. v. Linden. Those are all stops. They're not a consensual encounter.

He wasn't free to leave, and he certainly wasn't free to leave 58 seconds after they pulled their guns on him.

The Court has noticed there's no warrant in the file. And a wellness check that isn't initiated by a family member or someone else that's concerned for Mr. Brown's safety. And clearly in the 58 seconds of the video, it is clear that Mr. Brown is not dead, he is not unconscious. There's no suggestion in the report that he's drunk or impaired. He's just a black man alone in an old car on a cellphone waiting to go to the movies. That's not a reason -- that's not a reason to go search him.

And what Sergeant Shaheed did was to search his car. She put her flashlight in through his car and searched his car. And the fact that he did have a firearm, whether it was an open carry firearm or a concealed carry firearm, for which he didn't have a permit, is clearly identifiable in Kilburn because Kilburn says it doesn't make any difference; that alone isn't a reason. There has to be an articulable suspicion of some additional criminal activity that has happened, that is happening, or is about to happen. And we got none of that here.

Now, there's an exception to Kilburn, a

threat. A threatening motion, a furtive gesture. Deputy Velez says none of that happened.

So there's nothing here to suggest that this stop and the subsequent search are legally permissible. They're simply not in accordance with the law and the Fourth Amendment and the Constitution of the State of Florida.

And I'll take the sandwich and let her do her.

THE COURT: Okay.

MR. MAXWELL: Thank you.

THE COURT: Ms. Louis.

(Brief pause in proceedings.)

MS. LOUIS: Your Honor, do you have the -- do you have (indiscernible) currently or no?

THE COURT: I think I have Kilburn that he gave me.

MS. LOUIS: Oh.

THE COURT: I don't think you guys gave me anything so far.

MR. MAXWELL: Your laptop is on.

MS. LOUIS: Oh.

Sorry, Your Honor.

THE COURT: That's okay.

(Brief pause in proceedings.)

MS. LOUIS: Your Honor, may I approach?

THE COURT: Yes. Thanks.

MS. LOUIS: In this case the State would argue that the encounter between the Defendant and law enforcement was actually a wellness check, as reported in Deputy Velez's report and from Deputy Velez's statement. He -- that he said on the stand. He also went into saying that he is within -- he is placed within there. And the reason for these wellness checks is because within that area, as we also saw on the body-worn camera, many times people could be driving under the influence. They've encountered someone who was dead at one point, OD.

And so which is why they conducted the wellness check, especially since the first sign to them was the green car running, which a lot of times, as he stated, is an indicator for them to make contact with the person to make sure he was okay.

And per Deputy Velez's statement, he stated that when he does write his report, he goes off of the CAD time report that's listed within the document. He doesn't have a watch. He's not wearing anything. So the only thing he could rely on is what the CAD report says.

And within his testimony, he mentions that

the routine is to dispatch to -- to make contact with dispatch of his patrol. And whenever he has an encounter with an individual, dispatch is supposed to make the new timing. So which I would say kind of negates Defense counsel that the body camera video at the beginning of the encounter, that they requested that the State failed or refused to provide such recording, I would say it was accounted for based off of Deputy Velez's statement.

Furthermore -- furthermore, within the encounter with the Defendant, law enforcement -- Deputy Shaheed, who is Deputy Velez's partner, advised to Deputy Velez that there was a gun that was appearable to them -- that was appearable to them. So within that, the officer definitely has to detain the Defendant due to safety reasons -- due to safety reasons.

I would like to go to State v. Brumelow -- Brumelow. Sorry, I'm not pronouncing it correctly. It says, they cite that welfare -- welfare checks falls under the so-called community care doctrine, which is a judicial creation that carves out an exception to the Fourth Amendment warrants requirement by allowing police officers to engage in a seizure or search of a person or property solely for safety offenses.

And just to direct the Court, it's on page two at -- close to the bottom where the one -- the one is in brackets.

MR. MAXWELL: I'm sorry --

MS. LOUIS: It says --

MR. MAXWELL: -- Your Honor, I'm not sure where she's directing.

Page two or page three?

MS. LOUIS: No. Page --

MR. MAXWELL: You cited Brumelow?

MS. LOUIS: Page two. Yeah. It's right there.

MR. MAXWELL: Okay.

MS. LOUIS: And it says the community caretaker exception to the warrant requirement arising from the duty of a police officer to ensure the safety and welfare of the citizenry -- citizenry, at large. The function is focused on concerns for the safety of the general public. Thus, a warrantless search may be justified by exigent circumstances, which are those characterized by grave emergency, imperative for safetiness, and compelling need for action.

Which if we compare the two, even though there's some different circumstances happening here, one of the things that you did hear officer -- Deputy

Velez says is the reason why, he was doing the welfare check, but then it led to him detaining the Defendant due to safety reasons because a gun was there.

And furthermore, based off of Defense counsel's motion to suppress, Deputy Velez did give, on the stand, testimony that stated his come-around order was to Sergeant Shaheed -- Shaheed. And eventually, she did come around to assist. And the reason for him still having that stance is to still have control over the vehicle -- or not -- I'm sorry -- control over the Defendant. And based off of the body-worn camera, you can also see it was clear that the come-around statement was to Sergeant Shaheed because she did come around.

Furthermore -- and furthermore to that point, I would say that the search and seizure, that was -- there was an exception to the Fourth Amendment and Twelfth Amendment. And as counsel put in his motions to suppress, Article I, Section 12 of the Florida Constitution, because in State of Florida versus Echartevera, it states --

Hold on one minute. Sorry, Your Honor. One moment. One moment.

All right. It states that in order to validate a seizure predicate upon the plain view

doctrine, the State must prove three elements: The police must lawfully be in position from which they view an object, in which Sergeant -- Sergeant Shaheed -- Shaheed was; two, the object's incriminating character is immediately appearable, which it was, the weapon was not concealed, and it was within sight of the officer; and the officer -- the officers have a lawful right of access to the object, in which they did, because once they removed the Defendant from the vehicle and started to engage him about whether or not he had a concealed weapons permit, in which he did not, and also wasn't really familiar with it, officers had a -- officers had a -- officers had a lawful right of access to the object. The vehicle was open. They were able to get in. They were able to retrieve the vehicle -- retrieve the -- the -- the gun.

And again, based off of Deputy Velez's testimony, it was a wellness check. It wasn't a stop. The vehicle was already parked when they made an encounter with the Defendant. Also, they saw the -- the green vehicle -- the green Honda running from their position and came over there. So the State would argue there wasn't a stop to begin with. It was more so of a wellness check encounterment.

And lastly -- not lastly. Another issue is

that Defense counsel brings up that there's questions about the videos and everything, but as we can see, the arrest report states that it was dated November 14th, 2022. Deputy Velez testified that the date of incident -- that the time of incident was around 8:59 and that he was working the date of incident of November 14th, 2022. There was no arguments to that. So again --

And then also getting into the illegal detainment of Defense counsel's motion to suppress, he states that caselaw is abundantly clear that a deputy may only detain for as long as reasonable and necessary to substantiate or dispel criminal suspicion. Again, we heard on testimony from Deputy Velez that the Defendant wasn't under arrest until he was placed in vehicle. That he was only detained. The reasons for those questionings is to see if he had a concealed weapons permit, which gave him -- just the sight of the gun gave them enough reasonable suspicion to retrieve the -- retrieve the gun and everything. And so again, it just further proves that the detainment wasn't illegal.

Lastly, we would say that the moment the Defendant confirmed that he didn't have a concealed weapons permit, it gave probable cause that -- it gave probable cause that a criminal activity was afoot. And

so we would say that the arrest was valid.

Final matter. The State would argue in Cummings v. State of Florida, where it states that on the bottom of page one, to be exact, on the right-hand side, it states that the inevitable discovery doctrine allows evidence obtained as the result of unconstitutional -- unconstitutional police procedure to be admitted if the evidence would ultimately have been discovered by legal means. The court reasoned that exclusion of physical evidence that would inevitably have been discovered adds nothing to either the integrity or fairness of -- of the criminal trial. The inevitable discovery doctrine requires the State to establish by a preponderance of the evidence that police ultimately would have discovered the evidence independently of the improper police conduct by means of normal investigation (indiscernible) inevitably would have been set in motion as a matter of routine police procedure.

And, Your Honor, I would just further argue that because they were patrolling the area, law enforcement probably would have seen the -- the gun in plain sight either way even if the Defendant was present or not, which inevitably, we would have discovered the gun, and it would have turned into an

arrest at that point either way.

Nothing further from the State.

THE COURT: Okay.

MS. LOUIS: Thank you.

THE COURT: Mr. Maxwell.

MR. MAXWELL: Okay. Thank you, Judge.

Starting at the end of the argument, Your Honor, what State is suggesting is that the officers would be searching cars without occupants, which is also a Fourth Amendment violation. So the inevitative discovery rule wouldn't apply.

And Cummings speaks to a legitimate traffic stop during which they observed contraband. There's no legitimate traffic stop here, because as they've said, there was never a stop.

Echartevera, we've already talked about, the plain view doctrine. If they're in a lawful position to view the contraband. But in order for them to be in a lawful position to view contraband, it has to first be contraband.

And under Brumelow, there's no call in here, there's no wellness check.

And in order for an officer to conduct the search that they conducted, they would have to demonstrate some form of exigent emergency

circumstance, which is not in the report, and wasn't in Deputy Velez's testimony. He was just having a casual conversation with Mr. Brown at which time he pulled a gun on him and ordered him out of his car.

On Ross, again that is a contraband case, which indicates that there has to be probable cause that the car contained evidence of a crime and there was a legitimate stop in process. Here we have no legitimate stop in process.

And all of these cases are superceded by Kilburn because Kilburn addresses the very issue at heart here. What Deputy Velez is being -- is -- is suggesting is that, I can say I'm checking on your wellbeing any time I want to conduct a search. I can stop you walking down the street. Well, we've created an exception to Terry v. Ohio. I can just stop you to ask how you're feeling. And if you tell me something rude, well, now I can arrest you for resisting arrest and then I can conduct a search and then I can add on charges later.

Mr. Brown was in custody, and he was questioned while in custody without Miranda, in direct violation of what Deputy Velez knows is the rule. He knows he's not supposed to do that, and he did it anyway. And he says, well, I was trying to clear him.

As Deputy Velez testified, his job is to enforce the laws of the State of Florida and Orange County, not to decide whether or not someone should or should not be cleared of a crime.

State argues that the moment the Defendant gave a statement he didn't have a concealed weapons permit, that was probable cause to move forward with further investigation; but that statement is pre-Miranda, during detention, and it is not admissible. And without that admission the State has no basis for the search, and it must be excluded from evidence. Without that exclusion, Mr. Brown's Fourth Amendment rights have been violated.

Thank you, Your Honor.

THE COURT: Okay.

MR. MAXWELL: Oh, and for the record, we move to suppress the evidence and dismiss the case with prejudice.

THE COURT: Yes, sir.

Okay. So I'll be honest with you, because this is county court and I pretty much only get DUIs instead of motions to suppress, I'm not familiar with this Kilburn case, so I would like to read through it. I was just going to look. Are there any dates on this case or --

THE CLERK: Yes, Judge. It's set for April 27th.

THE COURT: April 27th?

THE CLERK: Uh-huh.

THE COURT: Oh, yeah, plenty of time.

So why don't we do this, I'll keep the April 27th status hearing for now, but I will get you ruling way before then, but I just want to be able to read through the Kilburn case. And I'll put something in writing and get it out to you hopefully by next week.

MR. MAXWELL: Thank you, Judge.

THE COURT: Okay.

MS. LOUIS: Thank you.

THE COURT: Okay. Thank you.

Okay. We will be in recess until 1:30.

(Court is in recess.)

C E R T I F I C A T I O N

Esquire Deposition Solutions does hereby certify that, through an independent contractor, we have transcribed the audio-recording, and that the foregoing is a true and complete transcription of the audio-recording. Inaudible or indiscernible passages of sound are denoted.

IN WITNESS WHEREOF, I do hereunto set my hand on this 1st day of April, 2024.

______________________________
Christine Aiello

For Esquire Deposition Solutions

**0**

**022127** 35:9
**0236** 36:8
**023655** 35:7
**0239** 36:24 37:6 38:1

**1**

**1** 13:1,6,7 53:16 54:7,23
**10:00** 42:20
**11** 34:17 41:6
**11/14** 42:19
**11/14/22** 34:13
**11/15** 34:17,23 35:9 36:5,25 37:7 38:2,3 42:19
**12** 62:19
**14th** 7:2,5 8:20 10:8 30:12 31:4 38:25 39:2 40:12 41:1 64:3,6
**1500** 8:23
**15th** 38:25 40:12
**16th** 5:7
**1:30** 69:16

**2**

**20** 33:7,9 40:23
**200236** 37:25
**2006** 56:10
**2020** 56:3
**2021** 31:24 36:5
**2022** 7:2,5 8:20 10:8 64:4,7
**2036** 37:3
**2039** 37:3
**2059** 33:10 40:21
**21** 40:23
**2123** 34:4
**22** 34:17,23
**22/11/15** 41:6
**23** 33:9 36:24
**24** 33:9
**27th** 69:2,3,7
**2:30** 40:25

**5**

**50-something** 36:8
**58** 45:6 57:2,7

**8**

**8963** 34:7
**8986** 32:20 34:6
**8:59** 9:3 12:1 64:5

**A**

**a.m.** 41:10,12,20,21 42:2,4
**ability** 44:13
**abnormalities** 55:12
**Absolutely** 30:5
**abundantly** 64:10
**academy** 8:6,7,11,13 47:24,25 48:8 52:18
**access** 63:8,14
**accessible** 49:13 50:20 51:4,16 52:11
**accordance** 58:5
**accounted** 60:8
**accuracy** 39:20
**accurately** 12:15
**acknowledge** 41:5
**action** 61:22
**activated** 10:11 11:23
**active** 11:22
**activity** 57:22 64:25
**add** 67:19
**additional** 57:22
**address** 5:19
**addresses** 56:13 67:11
**addressing** 46:10
**adds** 65:11
**admissible** 68:10
**admission** 68:10
**admitted** 13:1 54:7 65:8
**advice** 15:19
**advise** 52:21
**advised** 18:23,25 27:5 28:13 60:12
**advising** 16:16

**affidavit**
32:2 52:3
53:10,22

**affirm**
5:25

**afoot**
64:25

**age**
53:3,5

**agree**
40:10
42:9

**agreement**
39:4

**ahead**
5:23
19:21
23:13
53:9 55:7

**Ale**
9:1,9
34:7,14

**allowed**
16:19
27:15
30:14

**allowing**
60:23

**alter**
34:19

**Amendment**
58:6
60:23
62:17,18
66:10
68:13

**Amendments**
56:23

**ammo**
28:17

**ammunition**
49:23

**anymore**
33:16

**apparently**
56:8,19

**appearable**
28:22,24,
25 60:13,
14 63:5

**appears**
31:6

**applicable**
56:9

**apply**
66:11

**approach**
30:4
32:14
59:1

**approximately**
8:16 12:1
33:17
36:8
40:23

**April**
69:2,3,7

**area**
10:14
11:5,20
15:3 33:3
59:10
65:21

**areas**
11:5

**argue**
17:2 56:9
59:3
63:22
65:2,20

**argues**
68:5

**arguing**
17:12,14,
15,17

**argument**
55:7 66:7

**arguments**
64:7

**arising**
61:15

**arrest**
5:9 26:20
29:4 30:2
32:1,2
42:24
47:21
50:23
51:14
52:3
53:10,22
55:14,17
64:3,14
65:1 66:1
67:18

**arrested**
43:3,18

**Article**
62:19

**articulable**
57:21

**assist**
62:8

**assuming**
27:18

**attorney**
30:7

**audio**
17:21

**authenticatable**
39:10

**authority**
42:23

**aware**
48:6
51:10

**Axon**
37:8

**B**

**back**
5:6 11:21
19:12
20:23
26:3
32:10
43:15,16
46:13
52:25
55:9

**background**
14:1

**base**
50:14

**based**
11:7 17:7
41:14
48:16
52:17
60:8
62:4,11
63:17

**basic**
8:6,7,10

**basically**
13:25
35:16

**basing**
33:18

**basis**
55:17
56:15,16
68:11

**begin**
5:21
32:18
63:23

**beginning**
60:6

**behavior**
46:3

**believed**
44:10
49:13

**bike**
7:18

**bikes**
10:18

**bit**
15:19
22:1

**black**
57:10

**blame**
39:11

**body**
34:16,18,
19,22
35:6,8
37:4
38:16
39:13
42:4,16
60:5

**body-worn**
10:14
11:21
31:13
39:13
59:11
62:11

**bottom**
61:2 65:4

**brackets**
61:3

**brand-new**
34:2

**break**
6:18 55:9

**brings**
64:1

**bro**
15:19

**Brown**
5:5 9:5 14:22 15:6,11, 14,17,20, 24 16:4,8 24:2,21, 25 25:12, 19,24 28:21 29:4,12 42:17,18 44:20 45:4,8,22 46:6,11 56:18 57:8 67:3,21

**Brown's**
30:7 33:7 46:13 55:25 57:7 68:12

**Brumelow**
60:18,19 61:10 66:21

**Buster's**
32:21

**Busters**
34:6

**butt**
47:19

**C**

**CAD**
32:2 33:19,22 37:10 50:16 53:21 59:21,23

**call**
5:10 11:10 32:23 33:3,12, 13,19,22 34:2,9 37:11 54:25 55:4 56:21 66:21

**called**
6:5

**calls**
5:12 27:10 34:1

**camera**
10:14 11:21 31:13 34:16,18, 19,22 35:6,8 37:4 38:16 39:13 42:4,16 59:11 60:5 62:11

**cameras**
10:9,11 11:22 39:12

**capture**
11:25

**car**
9:13 10:20 20:10 23:5 24:8,11, 12,18 43:15 44:22 46:4 48:19,21 50:4 52:25 53:6,7 55:25 57:11,15, 16 59:16 67:4,7

**care**
60:21

**cared**
15:10

**careful**
6:17

**caretaker**
61:15

**carrier**
47:20

**carry**
26:24 57:17,18

**carrying**
43:1,23 47:5,9 48:7,14 50:21 56:14

**cars**
10:16 66:9

**carves**
60:22

**case**
48:11 52:10,12 56:3,10, 13 59:3 67:5 68:17,23, 25 69:9

**caselaw**
64:10

**cases**
67:10

**casual**
67:2

**cellphone**
57:11

**center**
28:21

**chamber**
28:17

**change**
33:8 34:5

**changed**
31:6

**character**
63:5

**characterized**
61:21

**charged**
46:20 47:6

**charges**
67:20

**check**
8:17 10:7,16, 20 11:8, 17,19 32:20 33:2,3,6, 13,21 34:7 45:12,16 57:5 59:5,15 62:2 63:18,24 66:22

**checked**
45:15

**checking**
11:13 67:13

**checks**
11:3,4,15 59:9 60:20

**Christopher**
9:5 14:22 15:6,11, 14,17,20, 24 16:4,8 24:2,21, 25 25:24

**circumstance**
67:1

**circumstances**
61:20,24

**cite**
60:20

**cited**
61:10

**citizenry** 61:17

**clarification** 13:9 14:11 37:21 50:13

**clarify** 11:12

**clean** 15:16

**clear** 29:25 52:13 57:8 62:12 64:10 67:25

**cleared** 68:4

**CLERK** 5:24 6:7 69:1,4

**client** 38:21 39:9

**close** 61:2

**come-around** 62:6,12

**commit** 45:8

**committed** 56:2

**committing** 44:12 45:24 56:18

**communications** 14:21

**community** 60:21 61:14

**company** 39:12

**compare** 61:23

**compelling** 61:22

**completed** 8:6

**completely** 32:23 33:4

**complicated** 7:17

**comply** 31:14

**computer** 33:24 35:11

**concealed** 27:2,4 28:8,12 29:6 43:1 47:9,14, 20 51:6, 8,17 56:14 57:18 63:6,11 64:16,23 68:6

**concern** 39:25 40:15

**concerned** 38:14 39:6 54:13 57:6

**concerns** 61:18

**conduct** 48:10 56:5 65:16 66:23 67:14,19

**conducted** 59:14 66:24

**confirm** 51:15,16

**confirmed** 29:6 64:23

**connected** 14:4

**consensual** 44:19 45:10,12 56:25

**considered** 14:18

**consistent** 40:11

**console** 28:21

**constantly** 45:18

**constitute** 15:4

**constitutes** 47:20

**Constitution** 58:6 62:20

**contact** 9:4,16,17 10:24 11:18 45:9 59:17 60:1

**contained** 67:7

**continuation** 34:3

**continue** 19:2 29:14

**continued** 34:7

**contraband** 49:25 50:2 56:11 66:13,18, 19,20 67:5

**control** 25:12,18 34:25 37:19 62:9,10

**conversation** 45:2 67:3

**convict** 39:9

**convicted** 44:4,7,10

**copy** 56:7

**cord** 6:17

**corner** 41:7

**correct** 33:15 38:22

**corrected** 40:22

**corrections** 34:10

**correctly** 60:19

**corridor** 7:17

**counsel** 13:5 35:13 36:2 41:9 60:5 62:18 64:1

**counsel's** 41:14 62:5 64:9

**county** 7:1,4,6, 13,23,24 8:4,8 29:19 31:8,10, 19 38:22 39:12 68:2,21

**court** 5:9,14, 20,22 6:8,11, 15,17 12:25 13:8,16, 23 14:5, 9,13,15, 18 16:24 17:2,10, 13,20,23 18:4,7,

15,17,19 19:3,5, 10,12 20:3,19 21:4,6,8, 11,14,17 22:1 23:13,19 26:2,14 27:17,22, 25 29:21 30:1,5, 15,18 32:1,5, 12,15 35:2,21 36:15 37:18,20, 25 38:3, 6,8,12, 19,24 39:3,16, 23 40:4, 6,9,15, 19,24 41:2,4,17 42:8 49:3,6,9 50:9 51:19,21, 24 53:12, 15,21,24 54:6,9, 15,17,19, 22 55:2, 6,19,22 56:2,20 57:4 58:10,12, 16,19,24 59:2 61:1 65:9 66:3,5 68:15,19, 21 69:3, 5,13,15

**cover** 7:20

**crannies** 50:3

**crap** 20:19

**created** 67:15

**creates** 39:12

**creation** 60:22

**crime** 42:25 43:1 44:12 45:8,19, 24 56:1, 17 67:7 68:4

**criminal** 57:22 64:12,25 65:12

**cross** 5:21 51:22

**CROSS-EXAMINATION** 30:9

**cross-examine** 23:16

**Cummings** 65:3 66:12

**custodial** 31:20 41:8

**custody** 34:13 43:25 47:3,12 52:7 56:15 67:21,22

**D**

**dash** 24:1

**date** 8:19 10:11 11:23 12:11 39:5,11, 24 40:7, 10,11 41:6 64:4,6

**dated** 64:3

**dates** 39:15 68:24

**Dave** 32:21 34:6

**day** 9:3 15:8 30:6 38:17 52:4

**days** 15:9

**dead** 15:9 45:17 57:8 59:13

**decide** 68:3

**decor** 47:16

**defendant** 9:18 10:6 27:1,20, 23 50:17 52:21 59:4 60:11,16 62:2,11 63:9,20 64:14,23 65:23 68:5

**Defense** 13:5 53:15 54:13,22, 23 55:11 60:5 62:4 64:1,9

**defense's** 54:7

**demonstrate** 66:25

**department** 8:1 31:10

**depict** 12:16

**deputy** 5:13,18, 23 6:22 7:10,11 8:4,15 13:10 14:12,25 15:7,12, 15,18,22 16:1,5,9, 11,14 17:18 18:11,22 19:5,17, 22,25 20:7,9, 11,13 22:8,13, 20 23:1, 4,6,22,25 24:4,7, 11,14,16, 22 25:2,5 26:7,16 31:20,23 32:7 35:24 36:20 38:15 39:11 40:21 41:19 44:5 50:13 54:19 55:15 56:19 58:2 59:6,19 60:9,11, 12,13 61:25 62:5 63:17 64:4,10, 13 67:2, 12,23 68:1

**detail** 8:10

**details** 7:14

**detain** 44:18 48:2,4 60:15 64:11

**detained** 26:25 43:7,9,

21,22 50:22,25 51:2 52:20,21 64:15

**detaining** 62:2

**detainment** 64:9,20

**detention** 52:16 68:9

**determine** 48:2

**difference** 57:20

**direct** 6:20 27:7,9 28:3 38:15 51:6 61:1 67:22

**directing** 61:7

**dirt** 15:22

**dirty** 15:16

**discovered** 65:9,11, 15,25

**discovery** 53:19 65:5,13 66:11

**discuss** 5:15

**dismiss** 68:17

**dispatch** 10:24 11:7,8,13 60:1,2,3

**dispatcher** 32:22

**dispel** 64:12

**display** 47:19

**distinguishable** 56:12

**doctrine** 56:9 60:21 63:1 65:5,13 66:17

**document** 59:21

**door** 24:10

**draws** 20:23

**drive** 7:17 9:2 10:19 32:20

**driver's** 9:24,25

**driving** 59:11

**drug** 10:17 56:11

**drunk** 15:3 57:10

**due** 14:19 26:24 60:16 62:3

**DUI** 15:5

**DUIS** 68:21

**duly** 6:5

**duties** 7:11,15

**duty** 45:18 61:16

**E**

**east** 7:22

**Echartevera** 56:8,10 62:21 66:16

**edited** 42:20

**effective** 31:24

**elaborate** 56:6

**elements** 63:1

**emergency** 61:21 66:25

**employed** 6:25 7:3, 6 8:1

**emptying** 28:16

**encounter** 9:7 11:9, 11 27:6 29:3,8 32:17 33:7 38:16 40:21 42:17 44:13,19 45:3,10, 13 51:5 55:15 56:21,25 59:4 60:3,6,11 63:20

**encountered** 42:18 59:12

**encounterment** 10:6 17:5 63:24

**end** 9:22 33:23 36:9 43:17 66:7

**ended** 37:3

**ends** 35:6 36:6

**enforce** 7:12 68:1

**enforcement** 8:7,12 59:5 60:11 65:22

**engage** 60:24 63:10

**ensure** 61:16

**entire** 49:11

**equipped** 10:8

**erroneous** 55:14

**establish** 65:14

**establishing** 39:20

**evening** 31:4 42:17,20 55:13

**events** 11:25 29:17,18 55:13

**eventually** 25:9 62:7

**evidence** 13:2,5 28:18 39:9 53:11 54:8 65:6,8, 10,14,15 67:7 68:12,17

**exact** 65:4

**EXAMINATION** 6:20 50:11

**exception** 57:25

60:22
61:15
62:17
67:16

**excluded**
55:17
68:11

**exclusion**
65:10
68:12

**excused**
51:20
54:12

**Exhibit**
13:1,6,7
53:16
54:7

**exigent**
61:20
66:25

**experience**
52:18

**explain**
11:1
14:12
32:25
34:1,8

**explosive**
48:5

**extremely**
15:16

**F**

**fact**
17:14
39:6,14
56:14
57:16

**failed**
60:7

**fairly**
12:15

**fairness**
65:12

**falls**
60:20

**familiar**
31:7
63:12
68:22

**family**
57:6

**feel**
47:1

**feeling**
67:17

**fellow**
17:7
48:16,19

**felon**
44:4,7,10

**FEMALE**
14:4

**field**
8:9

**figure**
35:24

**figured**
30:8 43:3

**file**
5:9 57:5

**filed**
5:6

**Final**
65:2

**find**
5:7 32:12
48:1 50:2

**fine**
15:25
32:11

**finish**
16:25
26:12
35:22

**firearm**
26:18,24,
25 28:15
29:5
42:25
43:1,23,
24 44:2
45:4
47:7,9,20
48:3,5,8,
9,14,17,
22 49:12,
16 50:19
51:3,10,
11,15
52:11
56:5,10,
14 57:17,
18

**firearms**
27:4
49:14,22

**flashlight**
44:21
57:15

**Florida**
7:12,24
8:13
29:19
58:7
62:19,20
65:3 68:2

**focused**
61:18

**foot**
9:9 32:22

**footage**
33:25

**form**
66:25

**formed**
35:20

**forward**
68:7

**found**
15:8
49:12

**Fourteenth**
56:22

**Fourth**
56:22
58:6
60:23
62:17
66:10
68:12

**free**
44:20
57:1,2

**friends**
28:14

**front**
9:22,25
28:20

**full**
6:23
14:24

**function**
61:18

**furtive**
46:3 58:1

**G**

**game**
56:20

**gaps**
39:7
40:16

**garage**
14:24

**gave**
53:18
58:17,19
64:17,18,
24 68:6

**general**
31:19
33:3
61:19

**generally**
34:2

**generated**
34:8

**generates**
33:4

**gesture**
58:1

**give**
11:14
27:7,9
28:3 44:6
51:6 52:7
62:5

**giving**
15:18

**good**
30:6
49:1,7

**grainy**
20:21

**grave**
61:21

**green**
9:10
59:16
63:21

**grounds** 47:21 52:15 56:5

**guess** 39:3,23

**gun** 17:14,19, 22 18:23, 24 19:7, 14 20:24 25:19 28:14,19 46:12,23 47:4,13 48:1 60:13 62:3 63:16 64:18,19 65:22,25 67:4

**gunpoint** 46:22

**guns** 16:14 17:24 18:22 57:3

**guy** 15:8

**guys** 10:1 58:19

**H**

**hand** 5:25 23:23

**handcuff** 43:10

**handcuffed** 43:8 48:2 52:7

**handcuffs** 43:19 50:17,18 52:14

**hands** 19:25 23:1,22 24:13,17

**happen** 57:23

**happened** 23:11 25:21 26:17 28:11 29:11 57:23 58:2

**happening** 57:23 61:24

**hard** 8:18

**he'll** 30:16

**hear** 19:6,15 20:3 61:25

**heard** 17:25 18:1 64:13

**hearing** 69:7

**hearsay** 16:17,19 27:10,15

**heart** 67:12

**held** 46:22

**Hey** 24:16

**hold** 18:15,17 38:20 62:22

**holster** 26:18

**Honda** 63:21

**honest** 68:20

**Honor** 5:12,18 12:23 13:15 14:10 16:18,21 17:4,9,17 18:6,13, 14 19:2, 15 22:4 23:9 26:11 27:14,24 29:20,24 30:4,13 31:17 32:11,13 35:14 36:13 38:5,10, 18 39:8 40:8,14 41:3,16 42:6 49:2,8 50:8 51:18 53:9 54:5,13, 18 55:1, 5,8,11,21 56:10 58:14,23 59:1 61:6 62:22 65:20 66:8 68:14

**Hopkins** 56:23

**hours** 8:23,24 34:4 37:10 40:21,23

**House** 9:1,10 34:7,14

**hundreds** 8:18

**I**

**idea** 42:16

**identifiable** 57:19

**identification** 12:4,5,20 13:4

**identified** 9:4

**illegal** 64:8,21

**immediately** 48:9 63:5

**impaired** 57:10

**imperative** 61:21

**important** 35:23

**importantly** 39:5

**improper** 65:16

**inability** 14:20

**incident** 8:19 31:5 33:4 38:4 64:4,5,6

**incidents** 12:16

**included** 55:16

**incorrect** 39:5

**incriminating** 63:4

**independently** 65:16

**indication** 42:25

**indicator** 59:17

**indiscernible** 5:24 7:17,19, 21,22 8:24 9:10,11 10:25 11:5

13:18,19 15:21 18:24 20:5,12 21:21 22:23 23:21,24 24:6,8, 19,20,21 25:24 26:7,19, 25 30:2, 3,24 31:1,3,5, 6,11,15 32:18,24 33:7,12, 18 36:18, 20,24 37:11 47:2,17 48:16,24 50:6,21 51:11 54:4 58:15 65:17

**individual** 48:7 60:3

**inevitable** 65:5,13

**inevitably** 65:11,17, 24

**inevitative** 66:10

**influence** 59:12

**informing** 17:6

**initials** 12:10

**initiate** 11:18

**initiated** 8:16 32:20,23 33:6 34:17 38:16 44:12,19 45:9 57:5

**initiation** 33:6

**inquire** 41:16

**integrity** 65:12

**International** 7:16 9:2

**internet** 6:18 55:10

**investigate** 47:22

**investigating** 45:19

**investigation** 48:10 65:17 68:8

**invoked** 29:12

**isolated** 21:12

**issue** 32:19 46:10 56:13 63:25 67:11

**issues** 5:19 39:25

**J**

**J-O-N-A-T-H-A-N** 6:24

**jail** 38:22,25 39:2

**jammed** 28:20

**January** 5:7

**job** 68:1

**jobs** 14:23

**join** 36:1

**Jonathan** 5:13 6:4, 24

**Judge** 23:18 66:6 69:1,12

**judicial** 60:22

**jurisdiction** 7:25

**justified** 61:20

**K**

**Kevin** 30:6

**Kilburn** 56:12 57:19,20, 25 58:16 67:11 68:23 69:9

**kind** 60:4

**Kirbin** 56:2

**knew** 48:12,13, 15 52:17

**L**

**laboriously** 42:14

**laptop** 14:7 58:21

**large** 61:17

**lastly** 63:25 64:22

**late** 9:12

**law** 8:6,12 58:5 59:4 60:11 65:21

**lawful** 63:8,13 66:17,19

**lawfully** 63:2

**laws** 7:12 68:2

**leave** 44:21,23 45:1 46:24 57:1,2

**led** 62:2

**left** 43:20

**legal** 65:9

**legality** 48:3

**legally** 5:8 49:20 58:4

**legitimate** 66:12,14 67:8,9

**lights** 14:15

**Linden** 56:24

**listed** 59:21

**listen** 16:1

**located** 28:19

**location** 8:25 9:23 11:6,14 33:8 34:5

**lodged** 38:21,24

**long** 7:5 64:11

**longer**
52:15

**lot**
9:9 14:23
20:21,22
34:14
59:16

**lots**
10:19

**Louis**
5:10,12
6:8,10,
13,16,19,
21 12:3,
6,19,24
13:3,11,
13,15,18,
20,25
14:7,10,
14 16:13,
18,22
17:4,12
18:5,6,9,
10,12,16,
21 19:2,
4,9,11,
13,20,22
20:25
21:2,16,
19,23,25
22:2,4,6,
10,16,18
23:9
25:4,21
26:1,11,
15 27:11,
13,20,24
28:2
29:20
30:13,17,
21 31:17
32:4
34:24
35:14
36:3
38:18
40:1
41:3,5
42:6
49:2,4
50:10,12
51:18,20,
23,25
53:20
54:2,5,
18,24
55:1
58:12,14,
18,22
59:1,3
61:5,9,
11,14
66:4
69:14

**low**
20:16

**M**

**made**
9:15,17
11:18
63:19

**magazine**
28:17

**maintain**
25:12

**make**
9:13
10:21
15:2,7
28:16
34:11
39:17
45:16
48:24
55:7
57:20
59:17,18
60:1,4

**makes**
37:8

**making**
9:4 39:20

**man**
15:15
57:11

**marked**
12:4,20
13:4

**matter**
17:16
24:4
65:2,18

**Maxwell**
5:5,18
6:18
12:22
13:9,12,
19 16:17,
21,23
17:1,9,
11,17,21
18:3
21:4,5,7,
9,13
23:15,18
27:10
29:22,24
30:2,6,7,
10,19,22
32:6,11,
13,16
35:5,10
36:1,4,
13,16,22
37:24
38:2,5,7,
9,23
39:1,8,19
40:3,5,7,
13,18,20,
25 41:16,
18 42:12
47:16,18
48:25
49:7,10
50:7 52:2
53:9,14,
18,23,25
54:3,11,
16 55:3,
5,8,20,23
58:11,21
61:4,6,
10,13
66:5,6
68:16
69:12

**Meaning**
40:11

**means**
28:16
46:22
48:22,23
65:9,16

**member**
57:6

**mentions**
59:25

**mere**
56:4

**Michael**
9:5 14:22
15:6,11,
14,17,20,
24 16:4,8
24:2,21,
25 25:24

**midnight**
39:2

**military**
41:19,25
42:3,5,9,
11,13

**Miller**
9:1,9

**Miller's**
34:7

**mine**
9:24
11:24
20:22

**minute**
62:22

**minutes**
40:23

**Miranda**
29:9
52:8,22
67:22

**Mirandize**
43:15

**Mirandized**
53:6

**missing**
37:4
38:10,12
40:17
42:15

**mixing**
33:11

**mode**
39:21

**moment**
13:15
18:12
25:5,10
39:21
47:15
50:23
54:2
62:23
64:22
68:5

**momentary**

47:19

**morning**
37:6 40:1
41:1

**motion**
5:6,7
12:13
26:13
55:6 58:1
62:5 64:9
65:18

**motions**
16:19
27:15
62:18
68:22

**mouth**
20:14
23:7
46:19

**move**
6:8 16:7,
10,11
22:25
23:1
24:24
53:6
68:7,16

**moves**
12:19
13:3

**movies**
57:12

**moving**
25:1

**N**

**necessarily**
11:3

**needed**
5:15
45:14
52:15

**negates**
60:5

**newer**
32:9

**night**
9:12
12:16
30:11

**nooks**
50:3

**normal**
10:15
42:10
65:17

**note**
5:8

**noticed**
57:4

**November**
7:2,5
8:20 10:8
30:12
31:4
64:3,6

**number**
8:15

**numerous**
55:12

**O**

**oath**
52:4

**object**
31:19
42:6
63:3,8,14

**object's**
63:4

**objecting**
35:19

**objection**
12:23
16:17
23:10
27:10
31:18
34:24
35:3,15
49:3,4
53:17
54:5

**obscured**
15:22

**observed**
66:13

**obtained**
65:6

**occupants**
10:3 66:9

**occupied**
10:21

**occurred**
11:25
12:16
29:17,18

**occurring**
10:22

**OD**
59:13

**ODED**
45:17

**offenses**
60:25

**office**
7:1,4,7
8:5,8
31:19
35:16

**officer**
8:4,9,14
10:2 17:7
25:15,19
27:21
35:18
48:18,19
50:22
52:12,14
60:15
61:16,25
63:7
66:23

**officer's**
48:16

**officers**
39:16
60:24
63:7,12,
13 66:8

**Ohio**
67:16

**Oops**
51:25

**open**
14:17
24:10
26:24
43:23,24
47:13
51:3
57:17
63:14

**openly**
47:5
50:21

**opportunity**
12:12

**opposed**
40:12

**Orange**
7:1,4,6,
13,24
8:4,8
29:19
31:8,10,
19 38:22
39:12
68:2

**order**
23:7
31:20
46:19
62:6,24
66:18,23

**ordered**
67:4

**original**
37:21

**originated**
11:20

**overdosing**
10:17

**overruled**
28:1 35:3

**P**

**p.m.**
9:3 12:1
41:10,13,
20 42:2,4

**park**
14:23

**parked**
15:1
63:19

**parking**
9:9 10:19
14:24
34:14

**part**
35:23
37:4

38:12,13

**partner**
44:9
46:7,11
60:12

**party**
15:3

**pass**
15:4

**passed**
15:2,9

**passenger**
9:21,22

**patrol**
7:16 9:9
10:14,18,
19 11:20
32:22
33:18
60:2

**patrolling**
10:23
11:3
65:21

**patrols**
7:18

**pause**
13:14,17
14:6
26:5,10
31:16
36:12
58:13,25

**people**
14:23
15:3
45:16,17
59:11

**perfect**
40:6

**period**
8:12

**permissible**
58:4

**Permission**
13:7

**permit**
27:2,4
28:9,13
29:7 43:2
47:10,11
51:7,9,17
57:19
63:11
64:17,24
68:7

**person**
9:4
11:18,23
48:1 51:4
59:18
60:25

**persons**
9:13

**phone**
24:1,3

**phonetic**
56:3

**physical**
65:10

**piece**
42:15

**piecemeal**
37:23

**pieces**
35:7
38:10

**place**
42:24
53:10
55:15

**plain**
49:12
56:9
62:25
65:23
66:17

**play**
26:12
56:20

**playing**
23:10

**plenty**
69:5

**point**
14:12
16:14
27:1,6,12
28:3,7
29:3,8,14
37:12
46:10
49:7 51:5
59:13
62:15
66:1

**pointed**
38:11
46:13
55:12

**police**
33:10
43:16
52:18
60:24
61:16
63:2
65:7,15,
16,19

**policies**
31:7

**policy**
31:13
32:6,8
39:13
53:24,25

**position**
7:9 29:1
63:2,22
66:17,19

**positioned**
10:1

**possess**
51:17

**possessed**
27:4 51:8

**possession**
26:24
31:23
42:24
44:2

**possibly**
10:21
49:23

**pre-miranda**
68:9

**predicate**
62:25

**prejudice**
68:18

**preponderance**
65:14

**presence**
5:20 56:5

**present**
65:24

**pretty**
39:4
68:21

**previous**
33:14

**previously**
12:4,20
13:4

**prior**
10:13

**probable**
56:1
64:24,25
67:6 68:7

**problem**
15:1
33:12

**procedure**
10:15
31:14
53:25
65:7,19

**procedures**
31:8

**proceeded**
28:15

**proceedings**
13:14,17
14:6,19
26:5,10
31:16
36:12
58:13,25

**process**
67:8,9

**pronouncing**
60:19

**property**
60:25

**proposition**
56:4

**Prosecution**
54:16

**prove**
63:1

**proves**
64:20

**provide**

60:7

**provided**
56:7

**public**
61:19

**publish**
13:7

**published**
14:17

**pull**
45:4

**pulled**
57:2 67:3

**pulls**
17:24

**purer**
20:23

**pushed**
46:13

**put**
11:4
23:25
36:14
39:21
53:21,23
57:15
62:18
69:9

**puzzle**
36:14

**Q**

**quality**
14:20

**question**
12:17
29:20
35:19,20
37:2,13
39:24
43:12
51:7,13
52:6,20

**questioned**
43:8,14
67:22

**questioning**
29:15
45:20,23

**questionings**
64:16

**questions**
18:20
32:7
45:11
50:7
51:18
53:1 54:9
64:1

**quickly**
52:13

**R**

**radio**
11:11
14:21

**Raise**
5:24
23:22

**reach**
19:24

**read**
5:7 29:9
68:23
69:9

**readily**
50:19
51:4,16
52:11

**realize**
15:3
21:10
40:2

**reason**
10:5 35:8
57:12,21
59:9
62:1,8

**reasonable**
26:23
50:20
64:11,18

**reasoned**
65:9

**reasons**
60:16,17
62:3
64:15

**recall**
8:25 9:4
38:11
44:11

**receive**
8:3

**recent**
56:13

**recess**
69:16

**recognize**
12:7,9

**recollection**
48:20

**record**
6:23
14:11,19
50:16
68:16

**recorded**
24:5

**recording**
55:13
60:8

**records**
31:21
41:8,23

**RECROSS-EXAMINATION**
52:1

**recruit**
52:18

**recruiter**
8:7

**REDIRECT**
50:11

**refer**
45:5,7

**refresh**
34:2

**refused**
60:7

**Reggie**
14:2

**related**
46:21

**relevancy**
49:5

**rely**
59:23

**removed**
42:21
63:9

**repeat**
25:17

**report**
30:11,14,
23 31:4,
17 32:2,
3,18
33:10,14,
15 34:11
40:22
50:14,15,
16 53:10,
21 55:14,
16 57:10
59:6,20,
21,23
64:3 67:1

**reported**
45:14
59:5

**reports**
11:15
41:25

**requested**
60:6

**required**
8:13

**requirement**
60:23
61:15

**requires**
65:13

**resisting**
67:18

**response**
27:7,9

**responsible**
39:20

**rest**
26:13

**restart**
14:7
26:12

**result**
65:6

**retrieve**
28:15
63:15,16
64:18,19

**retrieved** 29:5

**review** 56:6

**rewind** 19:11 21:2,24 22:1

**right-hand** 65:4

**rights** 52:8,22, 24 68:13

**Ross** 67:5

**routine** 60:1 65:18

**rude** 67:18

**rule** 17:7 23:12 66:11 67:23

**ruling** 69:8

**run** 10:17 31:4 32:3 53:10

**running** 9:11,12 14:1 59:16 63:21

**S**

**safe** 28:16

**safetiness** 61:22

**safety** 10:2 11:6 25:15,19 46:9,10 50:22 52:12,14 57:7 60:16,25 61:16,18 62:3

**sandwich** 58:8

**screen** 6:14 20:21,22

**search** 44:14 49:11,19 50:5,6 56:6 57:13,14 58:4 60:24 61:19 62:16 66:24 67:14,19 68:11

**searched** 43:15 50:3 55:25 57:16

**searching** 66:9

**seat** 28:20

**seconds** 35:7 36:9,24 45:3,6 57:2,7

**Section** 62:19

**sector** 7:20,21

**secure** 26:19 48:9

**seizure** 60:24 62:16,25

**separate** 53:12

**sergeant** 9:8,18 16:7,10, 16 17:6 18:23 19:24 20:8,10 22:22,25 23:3,5, 21,24 24:6,10, 12,15,19 25:7 26:16 28:5 48:17 55:19,20, 21 57:14 62:7,13 63:3

**service** 39:22 52:19

**set** 65:18 69:1

**Shaheed** 9:8,19 16:7,10, 16 17:6 19:24 20:8,10 22:22,25 23:3,5, 21,24 24:6,10, 12,15,19 26:16 28:5 55:20,21 57:14 60:12 62:7,13 63:3,4

**sheriff** 7:10,11

**Sheriff's** 7:1,4,6 8:5,8 31:10,19

**sheriffs** 28:14

**shift** 8:22

**shortly** 27:3

**show** 12:21 30:16 34:16,22 35:11,23 45:17 52:3

**showing** 12:3 14:1

**shown** 13:5 38:14

**side** 9:21,24, 25 65:5

**sight** 17:8 63:6 64:17 65:23

**sign** 52:4 59:15

**signaling** 17:6

**signature** 12:10

**simply** 56:4 58:5

**sir** 17:10 34:6,19, 21 37:7, 14 43:17 46:25 50:5 52:23 53:2,4 68:19

**sitting** 28:21

**situation** 17:5 32:25

**six-month** 8:12

**slowly** 24:1,8

**so-called** 60:21

**solely** 60:25

**sort** 6:11 37:22

**sound** 14:19

**speak**
29:13

**SPEAKER**
14:4

**speaking**
25:17

**speaks**
66:12

**special**
11:2

**specifically**
7:16
35:17

**speculation**
41:14

**speculative**
42:7

**spell**
6:23

**spoken**
25:16

**stabbed**
48:25

**stance**
62:9

**stand**
5:13 59:7
62:6

**standby**
39:21

**standing**
21:17
28:10

**stands**
40:22
56:3

**start**
11:12

**started**
5:16
19:16,23
20:6
22:7,12,
19,24
23:20
25:23
26:6
34:23
35:11
36:19
37:3
40:21,23,
25 45:20
63:10

**Starting**
66:7

**starts**
35:9
36:5,17,
24 38:15

**state**
5:12 6:5,
22 7:12,
23 8:13
12:19,20
13:3,4,5,
7 17:11
30:13
31:18
53:17
56:3,7,8,
19,23
58:6 59:3
60:7,18
62:20
63:1,22
65:2,3,13
66:2,8
68:2,5,10

**state's**
12:4,5
13:1

**stated**
59:17,19
62:6

**statement**
27:22
49:8 51:6
59:7,19
60:9
62:13
68:6,8

**states**
56:23
62:21,24
64:3,10
65:3,5

**status**
69:7

**step**
24:17
29:22
54:19

**stop**
34:23
44:18
56:18,21,
22 58:4
63:18,23
66:13,14,
15 67:8,
9,15,16

**stopped**
15:23
16:2,12
19:19
20:2,15
22:9,15,
21 23:8
25:3,25
26:9
36:21
44:13,15,
16

**stopping**
14:11

**stops**
56:24

**straight**
21:1

**street**
32:21
33:9
67:15

**stuck**
6:11
44:21

**subject**
25:18

**submit**
56:2

**subsequent**
58:4

**substantiate**
64:12

**sudden**
17:24

**sufficient**
5:8 49:20

**suggest**
41:10
58:3

**suggested**
56:17

**suggesting**
66:8
67:13

**suggestion**
57:9

**summarily**
42:16

**superceded**
67:10

**suppose**
11:10

**supposed**
11:11
39:17,19
52:20
60:3
67:24

**suppress**
5:6 62:5,
19 64:9
68:17,22

**suppresses**
16:19
27:15

**suspect**
48:7

**suspected**
48:11

**suspicion**
26:23
57:22
64:12,18

**Sustained**
49:6

**swear**
5:25 6:2
52:4

**sworn**
6:5

**systems**
39:15

**T**

**tag**
15:16

**taking**
28:18
47:16

**talked**
37:21
66:16

**talking** 23:16 45:24 46:7,17
**taught** 47:23,25 48:8
**team** 11:2
**technically** 35:16
**telling** 20:11 23:6 46:15,16
**tells** 27:19,21
**Terry** 67:16
**testified** 6:6 23:14 54:3 55:18 64:4 68:1
**testifies** 5:19
**testify** 17:11 55:16
**testifying** 17:12
**testimony** 33:14 38:15 59:25 62:6 63:18 64:13 67:2
**thing** 49:4 59:23
**things** 29:25 35:1 37:22 40:4 61:25
**thinks** 18:8 32:9
**threat** 58:1
**threaten** 46:1
**threatening** 58:1
**time** 12:11,19 13:3 26:20 32:17 33:11 39:6,18 40:16,20 41:7,11, 19,20,23, 24,25 42:2,3,4, 5,9,10, 11,13,15, 21 43:19 47:25 50:14 54:25 55:7,14 56:18 59:21 64:5 67:3,14 69:5
**times** 8:16 39:15 59:11,16
**timestamp** 11:19
**timestamps** 35:1 37:16
**timing** 60:4
**today** 12:13
**told** 17:19 28:5,14 52:24 55:18
**top** 33:5,6,19
**traffic** 66:12,14
**training** 8:3,8,9, 11 52:17, 18,19
**transcribed** 14:21
**transcript** 14:18
**transition** 7:21 8:19
**trial** 65:12
**trunk** 50:3
**truth** 6:1 17:16
**turn** 14:15 33:12 55:9
**turned** 65:25
**turns** 32:8
**Twelfth** 62:18
**type** 41:7

**U**

**U.S.** 56:24
**Uh-huh** 13:16 19:13 69:4
**ultimately** 65:8,15
**unauthenticated** 30:20
**unconcealed** 56:15
**unconscious** 57:9
**unconstitutional** 65:7
**understand** 15:5,14 16:5 19:17 22:13 24:7 39:24
**Understandable** 30:21
**understanding** 40:9
**unit** 43:16
**United** 56:23
**units** 7:18
**updated** 11:11 31:22,25

**V**

**V-E-L-E-Z** 6:24
**valid** 65:1
**validate** 62:25
**variety** 56:22
**vehicle** 9:15 10:3,4,20 25:20 28:15,16 44:14,16 46:25 49:11,14, 16 50:20 51:4,10, 12 62:10 63:10,14, 15,19,21 64:15
**vehicles** 9:12 10:19
**Velez** 5:13,19 6:4,22,24 14:12,25 15:7,12,

15,18,22 16:1,5,9, 11,14 17:19 18:11,22 19:17,25 20:7,9, 11,13 22:8,13, 20 23:1, 4,6,22,25 24:4,7, 11,14,16, 22 25:2,5 26:7,16 31:20,23 32:7 36:20 50:13 55:15,23 58:2 60:13 62:1,5 64:4,13 67:12,23 68:1

**Velez's** 13:10 59:6,19 60:9,12 63:17 67:2

**Verbally** 19:1

**verbatim** 14:19

**versus** 62:20

**video** 12:13,15 14:12 17:18,22 18:2 19:8 20:17 21:8,9,15 26:11,13 34:16,20, 22 35:6, 8,17 36:5,9, 10,17,23 37:2,5 38:1,12, 14,16 39:13 42:4,8 44:5 45:5,7 46:12,18 48:18 57:8 60:5

**video-recording** 14:17,20 16:12 19:16,19, 23 20:2, 6,15 22:7,9, 12,15,19, 21,24 23:8,20 25:3,23, 25 26:6,9 36:19,21

**videos** 13:10 38:8,9 40:1,13 41:9 42:17 64:2

**view** 10:4 12:12 30:14 41:14 49:12 56:9 62:25 63:3 66:17,18, 19

**violated** 68:13

**violation** 66:10 67:23

**volume** 25:22 26:1

**W**

**waiting** 23:11 57:11

**walk** 10:18

**walked** 9:15 44:21

**walking** 67:15

**warned** 16:3

**warrant** 5:9 55:25 57:4 61:15

**warrantless** 61:19

**warrants** 60:23

**watch** 59:22

**watching** 18:2

**weapon** 17:8 47:5,20 63:6

**weapons** 27:2 28:9,13 29:6 51:6,9,17 63:11 64:17,24 68:6

**wearing** 59:22

**week** 69:11

**welfare** 60:20 61:17 62:1

**wellbeing** 10:7 45:12,14 67:14

**wellness** 8:17 57:5 59:5,9,15 63:18,24 66:22

**wheel** 15:4,9 26:8

**withdraw** 49:7

**withdrawn** 16:15 18:22

**witnesses** 54:25 55:3

**wondering** 13:20 53:20

**Wong** 56:23,24

**word** 41:12 46:18 55:23 56:20

**work** 8:22 14:8

**working** 8:20 64:6

**worse** 20:22

**write** 11:15 50:14 59:20

**writing** 69:10

**wrong** 39:11 40:20 55:14

**Y**

**years** 7:8 8:15 52:19